UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWIN DENNIN,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No.  15-cv-03686-SK<br><br>**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Regarding Docket Nos. 12,13 |

This matter comes before the Court upon consideration of Plaintiff Edwin Dennin's ("Dennin") motion for summary judgment and the cross-motion for summary judgment filed by Defendant, the Commissioner of Social Security (the "Commissioner").  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.  Having carefully considered the administrative record, the parties' papers, and relevant legal authority, and the record in the case, the Court hereby DENIES Dennin's motion and GRANTS the Commissioner's cross-motion for summary judgment for the reasons set forth below.

## BACKGROUND

Dennin brings this action pursuant to 42 U.S.C. § 405(g) and seeks judicial review of the Commissioner's decision dated March 17, 2014 to deny his application for supplemental security income.[1]  Dennin amended his alleged onset date of disability to March 22, 2012.  (Administrative

---

[1] Dennin initially applied for both disability insurance benefits and supplemental security income.  At the hearing, the claimant withdrew his request for a hearing as to his application for disability insurance benefits.  Therefore, the administrative law judge dismissed his claim for disability insurance benefits.  Dennin's motion for summary judgment before this Court states that it is an appeal of the final administrative decision denying his claims for both disability insurance benefits and supplemental security income, but he fails to address the decision to dismiss his claim for disability insurance benefits in any substantive manner.  Therefore, the Court finds, to the extent that he intended to appeal the decision to dismiss his claim for disability insurance benefits, Dennin has waived this claim.  *See Carmickle v. Comm'n of Soc. Sec.*, 533 F.3d 1155, 1161 n. 2 (9th Cir. 2008).

Transcript ("AR") at 10.) When he submitted his application for supplemental security income on March 22, 2012, he was 39 years old and had limited education. (*Id*. at 18.) Dennin contends that he is disabled due to his post-traumatic stress disorder ("PTSD"), anxiety, chronic pain, neuropathy, and bilateral carpel tunnel syndrome. (*Id*. at 13.) At the hearing, he testified that he cannot work because of the pain he feels in his back, arms and wrist and that he has swelling and burning sensations. (*Id*. at 40.) Dennin further testified that he has anxiety when he works around people and he gets frustrated. (*Id*.) Dennin testified that he takes medication for his pain and that the medication helps, although sometimes the pain comes back and he has to take additional pain medication. (*Id*. at 41-42.) The medications cause him to be sleepy and have a dry mouth. (*Id.* at 43.)

Dennin had surgery for his carpel tunnel syndrome on his right hand in May of 2013, but testified that it did not help. He testified that his doctor wants him to have the surgery on his left hand as well. (*Id.* at 43-44.) Dennin wears braces on both of his arms and testified that one of the braces holds his elbow intact. (*Id.* at 44.) He has worn the braces for two years. (*Id.* at 45.) Dennin testified that he often has trouble sleeping at night due to thoughts racing through his mind. The number of nights he has trouble sleeping varies, but on average it is three to four nights a week. (*Id.* at 52-53.)

The ALJ determined that Dennin had the following severe impairments: post-traumatic stress disorder ("PTSD"), neuropathy, anxiety, chronic pain syndrome, and bilateral carpal tunnel syndrome. (*Id.* at 13.) The ALJ further found that Dennin's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. (*Id.* at 15.) In particular, the ALJ noted that the field office observed that Dennin did not appear to have any problems gripping while going through his papers during the interview. (*Id.* at 15 (citing *id.* at 218).) Moreover, although Dennin has received treatment for his alleged impairments, his treatment has been relatively routine and/or conservative. Despite his allegations of quite limiting pain, he has not taken any narcotic based pain relieving medications and has only taken nonsteroidal anti-inflammatory drugs and a muscle relaxant. The ALJ did not find any support in

the record for Dennin's claim that he has attended physical therapy. Dennin has refused injections, gabapentin, and psychiatric medications. (*Id.* at 15 (citing *id.* at 586, 619-20).) Finally, the ALJ noted that the daily activities Dennin described are not limited to the extent one which expect given his complaints about his disabling symptoms and limitations. Dennin reported that he could ride a bicycle without problems, even though riding a bicycle requires almost constant hand use and gripping. (*Id.* at 15 (citing *id.* at 234).)

Upon consideration of the record, the ALJ found that Dennin had the residual functional capacity ("RFC") to perform light work, except that he could perform frequent pushing and pulling with bilateral upper extremities, occasional climbing of ladders, ropes and scaffolds, frequent crawling, occasional bilateral upper extremity reaching, handling and fingering, and no exposure to extreme cold or vibration. (*Id.* at 14, 18.) The ALJ further found that he could perform simple, routine, repetitive tasks with no interaction with the public. (*Id.*)

At the hearing, a vocational expert ("VE") testified that an individual with Dennin's RFC could not perform his past work. However, the VE testified that an individual with those limitations had the residual functional capacity to work in the light, unskilled occupations of a battery inspector (DOT 727.687-066) and as a bakery worker (DOT 524.687-022). (*Id.* at 57-59.) There are approximately 1,100 to 1,200 positions in the State of California and 260,000 nationally as a battery inspector and 2,200 locally and 340,000 nationally as a bakery worker. (*Id.*)

Although the ALJ agreed that Dennin could not perform his past relevant work, the ALJ found that he could perform work that exists in significant numbers in the national economy. (*Id.* at 19.)

**ANALYSIS**

**A.    Standard of Review.**

A federal district court may not disturb the Commissioner's final decision unless it is based on legal error or the findings of fact are not supported by substantial evidence. 42 U.S.C. § 405(g); *Reddick v. Chater,* 157 F.3d 715, 720 (9th Cir. 1998). "Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039

3

1   (9th Cir. 1995). To determine whether substantial evidence exists, courts must look at the record
2   as a whole, considering both evidence that supports and undermines the findings by the
3   Administrative Law Judge ("ALJ"). *Reddick*, 157 F.3d at 720. The ALJ's decision must be
4   upheld, however, if the evidence is susceptible to more than one reasonable interpretation. *Id.* at
5   720-21.

**B.     Legal Standard for Establishing a Prima Facie Case for Disability.**

Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ applies a five-step sequential evaluation process to determine whether a plaintiff is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *see also* 20 C.F.R. § 404.1520. The plaintiff bears the burden of establishing a prima facie case for disability in the first four steps of evaluation. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). However, the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

The five-step analysis proceeds as follows. First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). Second, the claimant must have a "severe" impairment. 20 C.F.R. § 416.920(c). Third, if the claimant's impairment meets or equals one of the impairments listed in Appendix I to the regulation (a list of impairments presumed severe enough to preclude work), benefits are awarded without consideration of the claimant's age, education, or work experience. 20 C.F.R. § 20 C.F.R. 404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the ALJ will assess and make a finding about the claimant's residual functional capacity ("RFC") based on all relevant medical and other evidence in the claimant's case record. 20 C.F.R. § 416.920(e). The RFC measurement describes the most an individual can do despite his or her limitations. *Id.* § 404.1545(a)(1). If the claimant has the RFC to perform past relevant work, benefits will be denied. *See id.* § 404.1520(f). If the claimant cannot perform past relevant work, the ALJ will proceed to step five. *Id.* At the fifth step, if the claimant's impairments prevent him or her from making an adjustment to any other work in the national economy, the claimant will be found disabled. 20 C.F.R. § 404.1520(g).

4

### C. Substantial Evidence in the Record Supports the ALJ's Decision.

Dennin contends that the ALJ erred in determining that he could ambulate effectively and, thus, that his impairments did not meet or equal the listed impairments under 1.02, 11.14, or 12.04. Dennin further argues that the ALJ erred in disregarding the opinions of Dennin's treating physicians and in affording significant weight to the State's medical consultant's physical assessments.

#### 1. Listed Impairments.

To meet a listing, the Dennin must demonstrate that his impairments "satisf[y] all of the criteria of that listing . . . ." 20 C.F.R. § 404.1525(c)(3). To meet a listing, Plaintiff's impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). "Equivalence is determined on the basis of a comparison between the symptoms, signs and laboratory findings about the claimant's impairment as evidenced by the medical records with the medical criteria shown with the listed impairment." *Marcia v. Sullivan*, 900 F.2d 172,176 (9th Cir. 1990) (citation and internal quotation marks omitted). A claimaint's statements (or statements made by another person) of symptoms are insufficient to establish an impairment. *See* 20 C.F.R. § 416.928(a).

The ALJ considered the listed impairments under 1.02, 11.14, or 12.04 and found that the record, including the diagnostic testing and the findings reported by his treating physicians, did not support the existence of any functional limitations that meet or equal the criteria of any specific listing. (AR 13.) Dennin's entire argument with respect to the listed impairments is that the ALJ erred in determining that he could ambulate because he testified that he utilizes braces on both hands and takes prescribed medications. (Dennin's Mot. at 3-4 (Dkt. 16.).) The regulations define inability to ambulate effectively as "an extreme limitation of the ability to walk." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1 at 1.00(B)(2)(b)(1). Dennin has never argued that he cannot walk, and, in fact, stated that he has no trouble walking. (*See*, *e.g.*, AR 234.)

In support of his argument, Dennin also cites to a few pages of his testimony at the hearing before the ALJ. In the cited to testimony, Dennin states that his doctor wants him to have surgery on his left hand and then see what is happening with his elbow. He also testified that he is

1    attending physical therapy. He stated that the therapy helps, but that the pain comes back. He
2    further testified that he wears a brace that holds his elbow intact. (*Id.* at 44.) Lastly, Dennin
3    testified that he takes medications that help for the physical pain. (*Id.* at 41.) This testimony fails
4    to show that he had any trouble ambulating or otherwise meet the requisite criteria for the listed
5    impairments addressed by the ALJ. Dennin does not cite to any evidence, or even make any valid
6    argument, to show that the ALJ erred in her determination that his limitations do not meet or equal
7    a listed impairment, and, thus, fails to meet his burden. Nevertheless, the Court will address the
8    ALJ's findings for each listed impairment.

Listing 1.02 provides the following criteria for an impairment:

> "Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankyloses, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destructions, or ankyloses of the affected joint(s). With:
>
> Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c;

20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1. The ALJ found that the evidence in the record was not sufficient to show that: (1) Dennin suffered from a gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints; (2) there were findings on appropriate medically acceptable imaging of joint space narrowing, bony destructions, or anykloses of his affected joints; and (3) there was evidence that one major peripheral joint in each upper extremity is limited in its ability to perform fine and gross movements effectively.[2]

---

[2] The regulations define "inability to perform fine and gross movements effectively" as "an extreme loss of function of both upper extremities; *i.e.* an impairment(s) that interferes seriously with the individual's ability to independently initiate, sustain or complete activities. To use their

6

1   Upon a thorough review of the record, the Court finds that there is substantial evidence to
2   support the ALJ's conclusion.  Although Dennin suffers from carpel tunnel syndrome, there is
3   evidence in the record to support the ALJ's finding that it was not extreme enough to meet the
4   criteria of 1.02.  Notably, there is evidence in the record that Dennin had no trouble with his
5   personal hygiene, handling papers, or maintaining a home.  (AR at 195, 218, 416, 493.)  In
6   particular, the ALJ noted that Dennin reported that he could ride a bicycle without problems, even
7   though riding a bicycle requires almost constant hand use and gripping.  (*Id.* at 15.)  The ALJ
8   further noted that the Social Security field office reported that Dennin did not appear to have any
9   problems gripping while going through papers in his interview.  (*Id.*)  Accordingly, the Court finds
10  that the ALJ did not err in determining that Dennin's impairments did not meet or equal the
11  criteria of listing 1.02.

12  Listing 11.04 provides the following criteria for an impairment:  "Peripheral neuropathies.
13  With disorganization of motor function as described in 11.04B, in spite of prescribed treatment."
14  20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1.  11.04B, in turn, requires "[s]ignificant and persistent
15  disorganization of motor function in two extremities, resulting in sustained disturbance of gross
16  and dexterous movements, or gait and station."  *Id*.  There is sufficient evidence in the record to
17  support the ALJ's finding that Dennin's carpel tunnel syndrome was not sufficiently severe and
18  debilitating to meet the requirements of 11.04.  (AR 92, 106, 195, 218, 234, 416, 462, 493.)
19  Accordingly, the Court finds that the ALJ did not err when she found that Dennin's impairments
20  did not meet or equal the criteria of listing 11.04.

21  Listing 12.04 provides that affective disorders, characterized by a disturbance of mood,
22  accompanied by a full or partial manic or depressive syndrome is a listed impairment if certain
23  requirements are satisfied.[3]  The ALJ found that the medical evidence in the record did not support

---

upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1 at 1.00B2c.

[3] Listing 12.04 provides: "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

United States District Court
Northern District of California

a finding that the requirements of either paragraphs B or C of listing 12.04 were satisfied. To meet the criteria of paragraph B, the mental impairments must result in at least two of the following: (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or (4) repeated episodes of decompensation, each of extended duration. Marked means more than

---

A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome characterized by at least four of the following:
    a. Anhedonia or pervasive loss of interest in almost all activities; or
    b. Appetite disturbance with change in weight; or
    c. Sleep disturbance; or
    d. Psychomotor agitation or retardation; or
    e. Decreased energy; or
    f. Feelings of guilt or worthlessness; or
    g. Difficulty concentrating or thinking; or
    h. Thoughts of suicide; or
    i. Hallucinations, delusions, or paranoid thinking; or
    2. Manic syndrome characterized by at least three of the following:
    a. Hyperactivity; or
    b. Pressure of speech; or
    c. Flight of ideas; or
    d. Inflated self-esteem; or
    e. Decreased need for sleep; or
    f. Easy distractibility; or
    g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
    h. Hallucinations, delusions or paranoid thinking;
or
    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
    AND
B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;
    OR
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."
20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1 at 12.04.

moderate. 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1 at 12.00C. The ALJ found that Dennin only had mild restrictions in the activities of daily living because he reported that he could walk and ride a bicycle. (AR 14.) In social functioning, the ALJ found that he only had mild to moderate difficulties because he reported that he attended meetings, went to church, and went to bible study. She also found that he only had mild difficulties with concentration, persistence or pace. (*Id*.) Dennin does not point to any evidence in the record to demonstrate otherwise. The ALJ also found that he did not meet the requirements of paragraph C. (*Id*.) In light of the fact that Dennin has only been treated by a therapist for several months and has refused to take any psychiatric medications to alleviate his PTSD symptoms, the Court finds that the ALJ's determination is supported by substantial evidence in the record. Accordingly, the Court finds that the ALJ did not err in determining that Dennin's impairments did not meet or equal the criteria of a listed impairment.

### 2. Treating Physicians.

Dennin contests that the ALJ inappropriately discounted the opinions of his primary physicians, Dr. Maria Mulligan, nurse practitioner Rebecca Norwick, Dr. Mary Ellen Curran, as well as the consultative examiner, Dr. Jay Danzing. Dennin does not cite to any evidence in the record to support his argument. He merely summarily states that there are over 200 pages of treatment records, electrodiagnostic studies, and reports submitted into the record. (Dennin's Mot. at 4 (Dkt. 16.).) Dennin does not even summarize what he purports that the treatment records demonstrate. The Court is not required to address conclusory, unsupported arguments. *See Carmickle v. Comm'r*, 533 F.3d 1155, 1161 n. 2 (9th Cir. 2008) (declining to address issue that claimant failed to argue with specificity); *see also Brollier v. Astrue*, 2013 WL 1820826, *6 (N.D. Cal. Apr. 30, 2013) ("The Court is not required to consider conclusory unsupported arguments"); *Henricus v. Comm'r*, 2016 WL 362234, at 1 n. 3 (E.D. Cal. Jan. 29, 2016) (finding issue waived because plaintiff failed to argue with any specificity). Nevertheless, in the interest of fairness, the Court will consider whether the ALJ appropriately addressed the medical records.

The Ninth Circuit distinguishes "among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

1   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining
2   physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, the opinion of a
3   treating physician is entitled to greater weight than the opinion of a non-treating physician. *Id.*
4   However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of
5   an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144,
6   1148 (9th Cir. 2001). In order to properly reject an uncontradicted opinion of a treating or
7   examining doctor, the ALJ must state "clear and convincing reasons" for doing so. *Lester*, 81
8   F.3d at 830. If the treating physician's opinion is contradicted, an ALJ may reject the treating
9   physician's opinion if it states "specific and legitimate reasons" that are supported by substantial
10  evidence. *Id*. "The ALJ need not accept the opinion of any physician, including a treating
11  physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."
12  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see also Johnson v. Shalala,* 60 F.3d
13  1428, 1433 (9th Cir. 1995) (approving ALJ's rejection of medial report as self-contradictory).

14  The ALJ noted that Dennin was examined by Nurse Practitioner Rebecca Norwick ("NP
15  Norwick") in March 2012. On examination, she found that Dennin's neck was non-tender, and
16  that he was not tender in the extremities. She also found that he had good gripping of the bilateral
17  hands, no deformity, no bogginess of the joints, and no erythema. (AR 462.) During the
18  appointment NP Norwick completed a general assistance form. On the form she wrote that
19  Dennin had weakness and numbness in his forearms and that he could not perform gardening or
20  clerical work. (*Id*. at 451-52.) The ALJ found that NP Norwick's assessment on the form was not
21  supported by her own treatment records completed on the same day and, thus, properly discounted
22  it as unsupported. (*Id*. at 16.)

23  Dennin was first seen by Maryellen Curran, Ph.D. in August 2013. In November 2013, Dr.
24  Curran noted that Dennin adamantly refused to consider taking psychiatric medication. The ALJ
25  noted that Dr. Curran reported that she "spent a large amount of time trying to explain how the
26  racing thoughts, obsessive thinking, hypervigilance, and checking behaviors could be less
27  tormenting if he would consider taking some medication." (*Id*. at 16-17, 619.) She found that
28  Dennin's attitude was guarded, his mood was anxious, and he had a moderate impairment in

judgment. (*Id.* at 619-20.) At another appointment in November 2013, she assessed his Global Assessment Functioning ("GAF") at 32, despite the fact that she found Dennin's thought process was intact, his thought content was appropriate, he had no memory problems, and his judgment was only moderately impaired. (*Id.* at 17, 616-17.) A month later, in December, Dr. Curran completed a mental impairment questionnaire. She opined that Dennin had moderate limitations in his activities of daily living, marked limitations in social functioning and extreme limitations in concentration, persistence and pace. She assessed his GAF at 35, indicating some impairment in reality testing or communication (*e.g.* speech is at times illogical, obscure, or irrelevant) or that he has a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). (*Id.* at 17, 574-75.) The ALJ afforded this assessment little weight because of Dr. Curran's limited time of treating Dennin, she completed the evaluation with Dennin during an office visit which the ALJ found undermined her objectivity, and found that her assessment was not supported by her own treatment records. (*Id.* at 17.) The ALJ provided sufficient reasoning for discounting Dr. Curran's findings.

In June of 2013, NP Norwick and Maria Mulligan, M.D. completed a medical source statement. (*Id.* at 509-13.) They found that Dennin was capable of low stress jobs and wanted to work. They opined that he could sit, stand or walk for at least six hours, but could not do any lifting, handling, reaching, or fine manipulation with his hands, fingers or arms. They also found that he would be absent for three days a month. (*Id.*) The ALJ discounted these statements because they were not fully consistent with the Dennin's treatment records. In particular, the ALJ found that there was no support for Dennin missing three days of work a month. (*Id.* at 17.) The ALJ further found that there was no support for the limitation on lifting or on other manipulation and reaching. Moreover, this was not a restriction provided by any treating practitioner. (*Id.* at 17.) The ALJ noted that there was no indication in the record that Dr. Mulligan personally treated or signed off on the treatment of Dennin. (*Id.*) Discounting opinions that are not supported by the treatment records is permissible. *Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion

11

of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."); *see also Johnson,* 60 F.3d at 1433 (approving ALJ's rejection of medial report as self-contradictory).

Dr. Jay Danzing from the Department of Rehabilitation examined Dennin in July 2013. (AR 514-18.) He found Dennin's intelligence was average and found that Dennin was capable of rote and repetitive work. However, he found that Dennin would have trouble working due his "extreme carpel tunnel." (*Id*.) The ALJ noted that the treatment records only showed "moderate," not "extreme," carpel tunnel. The ALJ further noted that the treatment records were not available to Dr. Danzing and that, therefore, he must have relied on Dennin's own reported symptoms. (*Id*. at 18.) As a result, the ALJ discounted the assessment that Dennin would have trouble working due to his "extreme" carpel tunnel. Again, the ALJ need not accept opinions that are not adequately supported by clinical findings. *Thomas*, 278 F.3d at 957. Therefore, the Court finds that the ALJ did not err in discounting this statement.

The Court finds that the ALJ thoroughly considered the evidence in the record and that all of her findings are supported by substantial evidence. Dennin fails to cite to any evidence or provide any analysis to show otherwise. Accordingly, the DENIES Dennin's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court DENIES Dennin's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED**.

Dated: April 5, 2016

_____
SALLIE KIM
United States Magistrate Judge